<u>NOT FOR PUBLICATION</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOEL ROSARIO,<br><br>    Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE[1]<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Civil Action No. 06-5257 (PGS)<br><br>OPINION |

**SHERIDAN, U.S.D.J. :**

  This matter comes before the Court pursuant to Section 405(g) of the Social Security Act (the "Act"). Plaintiff Joel Rosario ("plaintiff" or "Rosario") seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Rosario's claim for disability benefits from April 6, 2001 to February 12, 2005. This Court has jurisdiction to review this matter under section 405(g) of the Act, and the Court renders its decision without oral argument. For the reasons set forth below, the Court affirm the final determination of the Commissioner.

**PROCEDURAL HISTORY**

  On September 6, 2001, Joel Rosario filed an application for a period of disability insurance benefits effective April 6, 2001, alleging an inability to work due to a heart condition

---

[1] Michael J. Astrue was substituted for Joanne Barnhart in his capacity as Acting Commissioner of Social Security.   Fed. R. Civ. P. 25(d)(1).

and depression (R. 6, 507, 513-15).  The claim was denied initially.  On June, 9 2004, the case was heard by Administrative Law Judge Dennis O'Leary.  ALJ O'Leary denied benefits by decision dated February 10, 2005.  On September 6, 2006, the Appeals Council denied Mr. Rosario's request for review which concluded administrative adjudication of the case.  Mr. Rosario filed a timely appeal of the ALJ's decision with this Court on November 2, 2006. During the pendency of this matter, Rosario filed a second application for benefits which was granted, and he began collecting Social Security Disability Benefits on February 12, 2005. Hence, this appeal focuses on plaintiff's request for residual disability payments for the period between April 6, 2001 and February 12, 2005.  He was unemployed during this period of time. In this respect, the Court must determine whether ALJ O'Leary's decision is supported by substantial evidence.

## FACTUAL BACKGROUND

Joel Rosario is a forty-six year old male with a high school education. His past work experience includes being a shipping and receiving clerk for an auto parts company, a chemical manager, and most recently as an inventory manager at an electronics store.  In plaintiff's past employment, he often lifted forty to fifty pounds. (R. at 509).

On April 6, 2001, Rosario was admitted to St. Francis Hospital where doctors administered a stress test which revealed abnormalities with his heart. (R. at 80-81). Shortly thereafter, a trans-esophophageal echocardiogram and a cardiac catheterization indicated that Rosario suffered from some cardiac abnormalities due to Marfan Syndrome.  Marfan Syndrome is a progressive genetic disorder "that affects multiple body systems including the skeleton, eyes, heart, blood vessels, nervous system, skin, and lungs.  Individuals with Marfan Syndrome have

abnormalities associated with the heart and blood vessels." 20 C.F.R. § 404 Subpt. P, App. 1, Note 10(a)-(b).  As a consequence of Marfan Syndrome, Rosario developed an aortic aneurysm which required his aortic valve to be replaced by a mechanical valve on May 10, 2001.  Mr. Rosario's post-operative prognosis presented only mild cardiac limitations and that his overall physical condition was markedly improved after surgery. The post surgery diagnostic tests confirm his improvement.  An echocardiogram taken on March 12, 2002 showed mild hypokenesis of the left ventricle. Myoview spect perfusion imaging with persantine infusion showed only minor defect of the apical region, but was otherwise normal. (R. 262).  A cartotid dopler test taken at Jersey City Medical Center on July 9, 2002 revealed no evidence of any significant plaques or stenosis. (R. 303).  A nuclear muga scan was performed on December 13, 2002.  The results revealed normal contraction of the left ventricular walls (R. 261). It is noted that Mr. Rosario was admitted to the Jersey City Medical Center December 27, 2002 for generalized fatigue. The admitting report states that he had not seen his cardiologist since October, 2001, that he had been non-compliant with his medications for two to three days, and that he was generally non-compliant with his medications because he could not afford them.  (R. 333, 338). On December 28, 2002 he denied chest pain, shortness of breath, dyspnea and palpitations, and he asked to be released on December 29, 2002.  (R. 343). On July 23, 2003, another echocardiogram revealed only a mild aortic insufficiency and trace tricuspid regurgitation. (R. at 272).

　　　　At the hearing, Mr. Rosario alleges that the systemic symptoms of Marfan Syndrome, such as joint pain, fatigue, and loss of stamina cause him serious limitations. He testified that he frequently experiences severe headaches and that his physical condition caused depression.

When asked how he had been functioning prior to his heart condition, he testified "I thought I was functioning fine." "I just took it that I was out of shape, but I was always kind of fatigued." (R. 507). He stated that he had been working as an inventory control manager for the Wiz which required loading and unloading merchandise weighing approximately 40 to 50 pounds, and that his previous work history was in shipping/receiving. He stated that he is fatigued constantly, has pain in the chest and that it is "not only a physical thing, but mentally it scares me," and that he felt better prior to the surgery. (R. 510). With regard to joint pain, he stated his right shoulder pops out from time to time and his elbows hurt if he leaves them bent too long. He stated that he can walk about a block and a half to the store and that's as far as he can go before he starts feeling a little fatigued. (R. 510). He stated that he lives with his wife and sister who do the grocery shopping, cooking and laundry since he is not able to lift the laundry basket. Plaintiff stated that he dresses himself, but that "half the time I'm in bed until 4:00 in the afternoon. I don't want to see daylight. I don't want to be around people right now. I don't socialize." He lacks motivation and doesn't want to get up in the mornings. (R. 513). He testified that he is currently taking Coumadin to thin his blood and that he is constantly going to the doctors to make adjustments. He testified that he is able to sit for a while, but gets pains up the back of his neck and headaches about once a day for about 30-45 minutes. (R. 513). As to depression, plaintiff testified that he was seeing a psychologist at the Jersey City Family Health Clinic before the clinic closed due to lack of funding, but plaintiff did not detail the duration or extent of such treatment. Plaintiff testified that he was prescribed Zoloft by Dr. Dela Cruz, a psychiatrist and that it is helping him to relax and sleep at night. (R. 514).

With regard to plaintiff's general medical condition, the Court's review of the record indicate that Rosario was treated and evaluated at the University Hospital approximately 20 times between September 15, 2003 and May 27, 2004. (R. 366 - 470). The majority of these visits were to attend Anticoagulation Management Encounters to monitor plaintiff's use and compliance with Coumadin. With the exception of the following instances, all of plaintiff's encounters at the University Hospital were for Coumadin management, for filling a prescription of Coumadin or for social work evaluations. When Rosario did seek treatment for other symptoms, they were intermittent in frequency.

*   On September 15, 2003, plaintiff was seen by Jennifer Zimmer, M.D, a cardiologist. At the time, he complained that he had chest tightness at rest and with lifting. He was able walk a flight of stairs with fatigue and had shortness of breath which lasts for 2 minutes. He was prescribed Lopressor to decrease wall stress.

*   On October 16, 2003, plaintiff underwent a stress echocardiogram. The test was stopped due to dizziness and left shoulder and arm cramping. The test revealed no ischemic changes in the EKG, and the stress echo revealed no wall motion abnormalities (R. 459). The conclusion was "negative for exercise induced ischemia at above stress level." It was noted that plaintiff did not reach the target heart rate which could result in a false negative test.

*   On October 27, 2003, plaintiff was again examined by Jennifer Zimmer, MD. His general physical examination was normal and the cardiovascular exam noted "crisp valve sounds". He was continued on Lopressor and referred to cardiac rehabilitation. (R. 449).

*   On January 20, 2004, plaintiff presented at the University Hospital and was seen by Yolette Sterling-Jean, M.D. His chief complaints were shooting chest pain which radiated into

his left shoulder and neck. He also complained of headaches 2-3 times per week. The pain was associated with dizziness, nausea and blurred vision. He also complained of chills, fatigue and weight loss. He was referred to cardiology, directed to have a CT scan and was referred to ophthalmology.

   *   According to the record, plaintiff was not seen at the University Hospital again until March 19, 2004 when he was seen for a routine Anticoagulation Management Encounter. At that time he admitted to being non-complaint with Coumadin and had "failed to implement requested changes at last visit". His symptom at the time was hypotension (abnormally low blood pressure) and the clinic reinforced the importance of adherence with recommended Coumadin therapy. (R. 412).

   *   On March 30, 2004, plaintiff was seen by Dr. Dhirmalani to renew his prescription. At that time he denied chest pain, palpitations, syncope, dyspnea on exertion and was otherwise "well developed well nourished and in no acute distress."

   *   From the beginning of April, 2004 until the end of May, 2004, plaintiff presented to the University Hospital clinic for education and monitoring on seven occasions with no complaints.

   As part of the disability determination process, plaintiff was examined by Michael Pollack, M.D. on March 23, 2003 (R. 170) for a consultative examination at the request of the Social Security Administration. At the time of the examination, Rosario complained of dyspnea on exertion, that he could walk only 2 to 3 blocks at a time before becoming exerted, and had difficulty climbing stairs. He denied any other complaints and was in no acute distress. His physical examination was otherwise unremarkable, and he was given a fair prognosis.

The diagnostic tests documented in the record show that an echocardiogram taken on March 12, 2002 showed mild hypokenesis of the left ventricle. Myoview spect perfusion imaging with persantine infusion showed only minor defect of the apical region, but was otherwise normal. (R. 262). A cartotid dopler test taken at Jersey City Medical Center on July 9, 2002 was negative. (R. 303). A nuclear muga scan was performed on December 13, 2002. The results revealed normal contraction of the left ventricular walls. (R. 261).

**Administrative Law Judge's Decision**

On February 10, 2005, the ALJ issued a decision concluding that Mr. Rosario was not disabled pursuant to 20 C.F.R. § 404.1520. Through proper application of the five-step process set forth in the Act, the ALJ O'Leary made the following findings:

* The claimant's Marfan's *[sic]* syndrome is a "severe" impairment, based upon the requirements in the regulations (20 CFR § 404.1520(c)).

* This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (Listing of Impairments), including any cardiovascular disorder contained under section 4.00 of the regulations.

* The undersigned finds that the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

* The claimant has the following residual functional capacity: light work (20 C.F.R. § 404.1567(b)).

* The claimant is unable to perform his past relevant work as either an inventory control manager or a shipping/receiving clerk (20 C.F.R. § 404.1565).

* The claimant is a "younger individual between the ages of 18 and 44" (20 C.F.R. § 404.1563).

* The claimant has a "high school education" (20 C.F.R. § 404.1564).

* It is deemed that the claimant does not possess transferable skills (20 C.F.R. § 404.1568).

\*      Based on an exertional capacity for light work, and the claimant's age, and work experience, a finding of "not disabled" is directed by the Medical-Vocational Rule 202.21.

\*      The claimant has not been under disability as defined in the Act and pertinent regulations, at any time through the date of the decision (20 C.F.R. § 404.1520(g)).

Decision of ALJ Dennis O'Leary, dated February 10, 2005, at 7.

I.

A claimant is considered disabled under the Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. *Id.* at § 423(d)(2)(A). *See Sykes*, *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). The Act requires an individualized determination of each plaintiff's disability based on evidence adduced at a hearing. *Sykes*, 228 F.3d at 263 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); *see* 42 U.S.C. § 405(b). The Act also grants authority to the Social Security Administration to enact regulations implementing these provisions. *See Heckler*, 461 U.S. at 466; *Sykes*, 228 F. 3d at 262.

The Social Security Administration has developed a five-step process set forth in the Code of Federal Regulations for evaluating the legitimacy of a claimant's disability. 20 C.F.R. § 404.1520. First, the plaintiff must establish that he is not currently engaging in substantial

gainful activity. 20 C.F.R. § 404.1520(a). If the claimant is engaged in substantial gainful activity, the claim for disability benefits will be denied. *See Plummer*, 186 F.3d at 428 (citing *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987)). In step two, if the claimant is not working, he must establish that he suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to demonstrate a severe impairment, the ALJ must deny disability benefits. *Id.* If the claimant suffers a severe impairment, step three requires the ALJ to determine, based on the medical evidence, whether the impairment matches or is equivalent to a listed impairment found in the "Listing of Impairments" located in 20 C.F.R. § 404, Subpart P, Appendix 1. If it does, the claimant is automatically disabled. 20 C.F.R. § 404.1520(e). But, the claimant will not be found disabled simply because he is unable to perform his previous work. *Burnett*, 220 F.3d at 118-20. The Third Circuit has required that in determining whether the claimant's impairments meet or equal any of the listed impairments, an ALJ must identify the relevant listed impairments, discuss the evidence, and explain his reasoning. *Burnett*, 220 F.3d at 119-20. A conclusory statement of this step of the analysis is inadequate and is "beyond meaningful judicial review." *Id.*

If the claimant does not suffer from a listed severe impairment or an equivalent, the ALJ proceeds to steps four and five. *Plummer*, 186 F. 3d at 428. In step four, the ALJ must consider whether the claimant "retains the residual functional capacity to perform [his or] her past relevant work." *Id.*; *see Sykes*, 228 F.3d at 263; 20 C.F.R. § 404.1520(d). This step requires the ALJ to do three things: 1) assert specific findings of fact with regard to the claimant's residual functional capacity ("RFC"); 2) make findings with regard to the physical and mental demands of the plaintiff's past relevant work; and 3) compare the RFC to the past relevant work, and based on

9

that comparison, determine whether the claimant is capable of performing the past relevant work. *Burnett*, 220 F.3d at 120.  The claimant bears the burden of proof for steps one, two and four of this five-step test. *Sykes*, 228 F.3d at 263.  The claimant bears the burden of proving that he is unable to return to his former type of work. *Wallace v. Sec'y of Health and Human Servs.*, 722 F.2d 1150, 1153 (1983).

If the claimant cannot perform the past work, the analysis proceeds to step five.  In this final step, the burden of production shifts to the Commissioner to determine whether there is any other work in the national economy that the claimant can perform. *See* 20 C.F.R. § 404.1520(f); *Sykes*, 228 F.3d at 263 (citing *Yuckert*, 482 U.S. at 146 n.5); *Burnett*, 220 F.3d at 118-19; *Plummer*, 186 F.3d at 429; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).  In demonstrating there is existing employment in the national economy that the claimant can perform, the ALJ can utilize the Medical-Vocational Guidelines (the "Grids") from Appendix 2 of the regulations, which consider age, physical ability, education and work experience. 20 C.F.R. § 404, Subpt. P, App.2.  However, when determining the availability of jobs for claimants with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the Grids alone," because the Grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels." *Sykes*, 228 F.3d at 269-70.  Instead, the Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the claimant's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation. *Id.* at 270-71, 273-74; *see also Burnett,* 220 F.3d at 126.  If this

evidence establishes that there is work that the claimant can perform, then he is not disabled. 20 C.F.R. § 404.1520(f).

## II.

The issue before the Court is whether the Commissioner's decision to deny Mr. Rosario's initial application for disability benefits is supported by substantial evidence. 42 U.S.C. § 405(g). In this respect, the District Court must uphold the Commissioner's factual determinations if they are supported by "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wallace v. Sec'y of Health and Human Servs.*, 722 F.2d 1150, 1153 n.2 (3d Cir. 1983) (*Richardson v. Perales*, 402 U.S. 389, 401 (1971)). An ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative, and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 n.9 (3d Cir. 2000).

Substantial deference is given to the credibility determinations of the ALJ. The ALJ has a duty to analyze all the evidence of the record and provide an adequate explanation for disregarding evidence. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). However, a plaintiff cannot rely on subjective complaints of pain or mental anguish as dispositive evidence of a disability. Thus, a plaintiff must offer objective medical evidence of a medically determinable condition that is reasonably expected to produce the symptoms alleged. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). Symptoms such as "pain, fatigue, shortness of breath, weakness, or nervousness will not be found to affect [the plaintiff's] ability to do work unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b). While the ALJ is required to give serious consideration to the claimant's

allegations of subjective pain and suffering, the ALJ's is equally obligated to weigh the claimants subjective complaints against the objective medical record before making a determination. *See* 20 C.F.R. § 404.1529(c)(2).

Such balancing inherently affords the ALJ discretion in determining the credibility of the claimant's subjective complaints. *Brown v. Schweiker*, 562 F. Supp. 284, 287 (E.D. Pa. 1983) (citing *Bolton v. Sec'y of Health and Human Servs.*, 504 F. Supp. 288 (E.D.N.Y. 1980)). The Court defers to the credibility determinations of the ALJ who has the opportunity to observe the claimant first hand. *See Wier v. Heckler*, 734 F.2d 955, 962 (3d Cir. 1984).

### III.

Plaintiff asserts a number of errors by the ALJ which require reversal or remand. Each is discussed below.

First, plaintiff argues that the ALJ "ignored severe physical and mental impairments" when performing the step two evaluation. A review of the decision shows otherwise. With regard to Marfan Syndrome, the ALJ acknowledged Marfan Syndrome as a "severe impairment", but noted

> Specifically, there is no evidence of congestive heart failure or ischemic heart disease with ejection fraction ratings at the levels set forth in medical listings 4.02 or 4.04b. There is similarly no documentation of valvular heart disease or cardiomyopathy with findings as contained in medical listings of 4.07 or 4.08 respectively.

ALJ Decision, p. 5. For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that meets only some of the criteria for a listed impairment "no matter how severely does not qualify". *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). The record supports that the ALJ considered Marfan Syndrome, but concluded

based upon the evidence that plaintiff's condition did not meet all of the specified medical criteria for a finding of disability.

Secondly, plaintiff argues that Marfan Syndrome must be considered with other subjective complaints such as chest tightness, shooting pains from left shoulder into arm, fatigue, chest pain and shortness of breath. The ALJ did not ignore such complaints as plaintiff suggests. More specifically, the ALJ stated:

> In making this assessment, the undersigned must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR §404.1529 and Social Security Ruling 96-7p" (Decision of ALJ, p. 5, R. 17).
>
> The evidence reflects a medically determinable impairment, Marfan's Syndrome, which is likely to cause the symptoms related by the claimant, however, not to the degree asserted. *Id.* at p. 5.

Hence, the ALJ found that subjective complaints existed, but found plaintiff was exaggerating their severity. As such, the ALJ was discounting the credibility of the plaintiff. The Court defers to such credibility determination.

Third, plaintiff argues that the ALJ's determination regarding plaintiff's mental impairments lacks substantial evidence, and that he failed to complete the record. With regard to plaintiff's complaints of depression, the Court finds that record supports the ALJ's conclusion that his psychiatric complaints do not meet or equal the requirements of listing 12.04 "affective disorders" 20 C.F.R. § 404, Subpt. P, App.2   More specifically, with regard to plaintiff's depression, the ALJ noted

> there is no evidence showing significant formal psychiatric or psychological treatment. The claimant was never hospitalized on a psychiatric basis, and was not maintained on psychotropic

> medicine regime. The post-hearing consultative psychological examination of Dr. Candela reflects that the claimant was fully functioning within the average range in all cognitive capabilities. (Decision, p. 5, R. 17)

A claimant suffers from a severe psychiatric impairment meriting a disability finding if, for example, the claimant has the inability to understand, carry out and remember simple instructions; has difficulty in the use of judgment; cannot respond appropriately to supervision, co-workers and usual work situations; and/or cannot deal with "changes in a routine work setting." 20 C.F.R. § 404.1521(b)(3)-(6). Further, the regulation concerning affective disorders (20 C.F.R. § 404, Subpt. P, App. 1, Sec. 12.04) states in part that an affective disorder is characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. *Id.* The substantial evidence of the record supports the ALJ's finding that plaintiff did not satisfy all of the requirements for a determination of disability due to depression especially since there was no hospitalization for depression nor any sustained psychotropic medicine regime.

      Plaintiff further contends that the report and recommendation of Dr. Candela, the consulting psychologist was insufficient. That is, the report "is incomplete and flawed because he only gave Mr. Rosario one examination, the Weschler III IQ test." However, in addition to the IQ testing, Dr. Candela observed plaintiff and found his verbal skills good and comprehension within normal range, with some slight inability to interact with other people. There is very little objective findings regarding depression in the record except for plaintiff's testimony that he "had seen Dr. De la Cruz for several months," and a single notation on that

there was a "psychic overlay to his condition." It is not enough to merely show the presence of a medically determinable impairment; the claimant must prove his depression is of such severity that it precludes performance of any substantially gainful activity. *Alexander v. Shalala*, 927 F. Supp. 785, 792-93 (D.N.J. 1995), *aff'd* 85 F.3d 611 (3d Cir. 1996); *see* 20 C.F.R. § 404.1520(c). Therefore, in light of Dr. Candela's expertise, the Court finds that the consultive examination provided a competent basis supporting the ALJ's final determination. A consultative examination is generally sufficient when it serves as an "adequate basis for decision making in terms of the impairment it addresses." 20 C.F.R. § 404.1519p(a)(1). Although he never administered a standardized psychological test, as a specialist in psychology, Dr. Candela closely observed Rosario's demeanor and in accordance with his expertise made findings logically consistent with the ALJ's determination. Dr. Candela found that Rosario could travel, socialize with friends and family and maintain good hygiene. In addition, he was cooperative, alert, and attentive. (R. at 476). Furthermore, Dr. Candela explicitly observed that Rosario's condition presented no more than moderate non-exertional limitations on his ability to work. (R. at 479-80). From Dr. Candela's characterization of Rosario's condition, the ALJ reasonably concluded that Rosario did not suffer from severe depression.

     Plaintiff contends that records from the Jersey City Health Clinic, if produced, would substantiate his psychiatric disorder. With regard to the availability of the records, plaintiff acknowledged that the Family Health Center terminated its practice. In light of same, rather than pursuing the records, the ALJ ordered a psychiatric evaluation from a psychologist. Plaintiff claims that the ALJ did not use "every reasonable effort" to complete the medical records as required by step two. See 20 CFR §404.1512(d). However, the ALJ is not required to seek

"additional medical evidence or clarification from a medical source where [the ALJ knows] from past experience that the source either cannot or will not provide the necessary findings." 20 C.F.R § 404.1512(e)(2). If such information is not available and the ALJ cannot make a determination based on the medical evidence of record, then the ALJ will order a consultive examination at the Commissioner's expense. 20 C.F.R. § 404.1512(f). Plaintiff's argument is not compelling because (a) the ALJ gave plaintiff ample opportunity to further produce evidence of a mental impairment after the hearing and the plaintiff did not do so; (b) the ALJ reasonably concluded that based on the number of failed retrieval attempts by plaintiff's own counsel, the ALJ would fare no better; and (c) there was an understanding between plaintiff's counsel and the ALJ, in which counsel agreed to try again to obtain Rosario's medical records from Family Health Center and if unsuccessful, the ALJ would order a consultive examination. The ALJ complied with that understanding. Hence, it appears that the ALJ acted in accordance with the request of plaintiff's counsel.

Fourth, plaintiff argues that the ALJ incorrectly concluded that plaintiff had the residual functional capacity to perform light work. The ALJ based his conclusion on the testimony of Dr. Donald Peysner, a medical expert who testified at plaintiff's hearing. Dr. Peysner's testimony confirmed that plaintiff had a mechanical valve in the aortic position of his heart which would require him to take anticoagulant medication for the rest of his life. (R. 517). With regard to plaintiff's prognosis from Marfan Syndrome, he testified that Mr. Rosario had probably already had his "catastrophic event" and that he was lucky to have had his heart condition diagnosed and treated. He testified that Mr. Rosario was "better off now than he was before" the surgery. (R. 519). Further, the doctor's review of plaintiff's stress test indicated that Rosario had a ejection

fraction of 48% which would not "meet any of the listings". He opined that plaintiff would be able to do light work, but would not be able to return to his previous type of work. Taking into consideration the physician's testimony that Rosario could not frequently lift 40 to 50 pounds on a regular basis as he had in his previous job as a inventory control manager or shipping/receiving clerk, the ALJ concluded that plaintiff had the residual capacity to perform light work. A person is capable of performing light work if they are able to "lift no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." Light work may also require "a good deal of walking or standing, or when it involves sitting most of the time [light work includes] some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Again, our inquiry is limited to whether the ALJ's determination is supported by substantial evidence.

The ALJ also relies on the April 4, 2002 Residual Capacity Assessment administered by the Social Security Administration (R. 177-184). At the time of the assessment, plaintiff's limitations were as follows: occasionally life and/or carry 20 pounds; frequently life and/or carry 10 pounds; stand and/or walk (with normal breaks) for about six hours in an 8 hour work day; sit (with normal breaks) for a total of about six hours in an 8 hour work day; unlimited push and/or pull (including operation of hand and/or foot controls). The report noted Rosario's shortness of breath after walking 2-3 blocks, and concluded that he was medically stable with an unremarkable exam, but that plaintiff was unable to perform heavy lifting and heavy exertions. This is consistent with Dr. Pollack's findings and the ALJ's decision. (R. 18, 171). The ALJ is entitled to give the state medical examiner's report great weight when supported by other medical evidence of record. 20 C.F.R. § 404.1527(f). Given the medical record, there is substantial

evidence to support the ALJ's determination that Rosario could perform light work. The weight of the medical record and the physician's reports confirm that Rosario did not suffer from a combination of impairments which would significantly affect his ability to engage in light work.

The plaintiff's final argument is that the ALJ erred at step five by mechanically applying the grids despite plaintiffs's non-exertional symptoms, including depression. The ALJ is entitled to solely rely on the grids when the claimant experiences only exertional limitations. *Heckler v. Campbell*, 461 U.S. 458, 467-68 (1983) (upholding the constitutionality of the Medical-Vocational Guidelines as applied to claimants who present no severe non-exertional limitations). In this case, it was the ALJ's determination that plaintiff's non-exertional symptoms were non-severe, and that he did not suffer from severe depression. The court's sole inquiry is whether the record, read as a whole, yields such evidence as would allow a reasonable mine to accept the conclusions reached by the Commissioner. Even where evidence is susceptible of more than one rationale interpretation, it is the Commissioner's conclusions which must be upheld. *Fargnoli v. Massanari,* 247 F. 3d 34, 38 (3d Cir. 2000); *Sample v. Schweiker*, 694 F. 2d 639, 642 (3rd Cir. 1981). This Court must affirm the ALJ's reliance on the Grids.

Because the Commissioner's determination that Rosario is not disabled is supported by substantial evidence, the decision to deny Rosario disability insurance benefits for the period in question is affirmed.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

October 15, 2007